IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Lemuel T. Kennedy, | ) | C/A No.: 3:13-289-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| South Carolina Department of Labor, | ) | |
| Licensing, and Regulation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In this employment discrimination case, Lemuel T. Kennedy ("Plaintiff") is suing his former employer, South Carolina Department of Labor, Licensing, and Regulation ("Defendant" or "LLR"). Plaintiff alleges race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII") and 42 U.S.C. § 1981 This matter comes before the court on Defendant's motion for summary judgment filed on January 10, 2014. [Entry #20]. This matter having been fully briefed [Entry #27, #28], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district court grant Defendant's motion for summary judgment.

I.     Factual Background

    A.     Plaintiff's employment and responsibilities

Plaintiff worked for Defendant from 1997 until his termination on September 14, 2011. Pl. Dep. 28:3, 86:2.[1] During his employment, Plaintiff served as an investigator in the Division of Professional Occupational Licensing ("POL"), specifically in the Office of Investigations and Enforcement ("OIE"). *Id*. at 26:8–17. As an investigator, Plaintiff's responsibilities included reviewing initial complaints, interviewing the complainants and relevant witnesses, preparing written findings of facts containing the results of his investigation, and assisting the Office of General Counsel and the relevant Boards and Commissions in presenting the case or resolving the complaint. *Id*. at 30:25–33:25. Plaintiff was assigned cases by his supervisor, Sharon Wolfe. *Id*. at 30:18–19. Plaintiff's chain of command was Supervisor Sharon Wolfe, Administrator Robert Laney, Assistant Deputy Director Mark Dorman, Deputy Director Rion Alvey, and LLR Director Catherine Templeton.

Plaintiff and other investigators used a case management software system called ReLAES. Investigators are required to enter all their communications and other significant developments in their cases into the ReLAES system in a timely fashion. *Id*. at 34:14–35:19.  Any communication with a complainant, respondent, or witness should be entered in the ReLAES system with a summary of what occurred. *Id*. The ReLAES system allows multiple staff members to determine the status of a case quickly, even in the absence of the investigator. The ReLAES system also allows supervisory employees

---

[1] Plaintiff's deposition may be found at Entry #20-2.

to manage case loads and case work progress. *Id*. In addition to the ReLAES system, OIE requires investigators to record their daily schedules on a Microsoft Outlook calendar. *Id*. at 35:20–36:15. The investigators' supervisors have access to the calendars to allow them to know where the investigators are and what they are doing on a daily basis. *Id*. Calendar entries must be entered prior to or at the beginning of each day. *Id*.

Because he spent most of his time in the field, Plaintiff was allowed to work from his home in Winnsboro, South Carolina, and was assigned a state vehicle for official use when traveling. *Id*. at 39:22–25; 40:17–22. Plaintiff was required to keep a "fleet log" to record the use of his state vehicle. *Id*. at 43:12–18. Although the log was submitted monthly, it was required to be completed on a daily basis. *Id*. at 44:10–13. Among other information, it contained the date of the trip, the beginning and ending odometer readings, the trip origin and destination, and the job function performed during the trip. *Id*. at 44:4– 46:12. While the fleet logs are supposed to be completed on a daily basis, it is possible for a driver to complete the log with incorrect entries, as long as the beginning and ending odometer readings for the month remain the same. *Id*. at 47:10-22.

B.    Plaintiff's Race Discrimination Claim

Plaintiff alleged Defendant discriminated against him because of his race (African American) based on its failure to promote him. Plaintiff applied for three Assistant Deputy Director positions in March 2011.[2] Plaintiff stated in his deposition that he would "just apply for everything" to see if "they would promote an African American." *Id*. at

---

[2] Although Plaintiff mentions that he filed additional applications around this same time that HR could not locate, he only exhausted his administrative remedies related to the three applications discussed herein. Pl. Dep. 72:3–15.

17:25–18:13. Plaintiff concedes he would have had to skip over several pay grades and levels of management to acquire an Assistant Deputy Director position. *Id*. at 52:12–20.

Plaintiff was interviewed for the three jobs at the same time by Deputy Director Alvey (white male) and Assistant General Counsel Lynne Rogers (African-American female). *Id*. at 56:2–8; 16:2–10. After his interview, Plaintiff received 24/40 points from Alvey and 37/40 points from Rogers. [Entry #20-17 at 6–7]. Alvey's rating of Plaintiff was nine points lower than his rating of any other candidate, while Rogers gave Plaintiff the highest score of all candidates other than 40/40 for Ido, Dorman, and Cook, who all received promotions. *Id*. at 6–17. Alvey's and Rogers' ratings of all other candidates did not vary by more than one point. *Id*.

      1.    Assistant Deputy Director for Office of Board Services Position

Defendant represents that the Office of Board Services ("OBS") position became vacant upon the retirement of Randy Bryant (white male). [Entry #20-1 at 5]. Defendant wanted an Assistant Deputy Director who had investigation and management experience and who could work with law enforcement. [Entry #20-16 at 2]. Plaintiff testified that he did not know what the OBS did, but that he would "see a job, look at the pay range and apply." Pl. Dep. at 57:22–58: 2. The OBS job was awarded to Charles Ido, who had 20 years' experience as a Secret Service agent and 14 years as an investigator for Defendant, seven of which he served as Chief of Investigations in the OIE. [Entry #20-17 at 3]. Ido received the maximum rating of 40 points by Rogers, who stated:

> Been with agency 21 yrs as investigator, chief investigator & acting Asst. Deputy. Provided training for investigators and attended training. Provided training for building officials around the state. Speaker at conferences.

4

*Id.* at 9. Ido also received a rating was rated of 40 points by Alvey, who stated:

> Mr. Ido has all the required experience and has demonstrated outstanding leadership characteristics. He has been filling this position on an interim basis and has performed on a high level that could only be described as substantially exceeds.

*Id.* at 8.

### 2.    Assistant Deputy Director for OIE

The second vacancy for which Plaintiff applied was an Assistant Deputy Director position in the OIE. This position became open upon the promotion of Alvey to Deputy Director. *Id.* at 8. Mark Dorman had served as interim Assistant Deputy Director over OIE while Alvey had been on temporary assignment and Defendant felt he had done a good job. *Id.* at 3. Rogers gave Dorman the maximum 40 points and stated: "Has over 30 years at LLR, has supervised investigations for all Boards, payment of wages - child labor." *Id.* at 10. Alvey also rated Dorman with 40 points and noted: "Mr. Dorman has all of the required training/experience/and skills. He has already acted as the ADD over OIE for two years when the former ADD was put on temporary assignment. Has 31 years of wages/child labor." *Id.* at 11.

### 3.    Assistant Deputy Director for the Drug Diversion Program ("DDP")

The third job for which Plaintiff applied was an Assistant Deputy Director position to supervise inspectors in the DDP. *Id.* at 3. The DDP is a program designed specifically to investigate healthcare professionals who divert lawful drugs to unlawful use. *Id.* At the time, the DDP was managed by Ron Cook. *Id.* As part of a reorganization at the agency,

all of the POL inspectors were transferred from OBS to the DDP. *Id.* As a result, the job was upgraded to an Assistant Deputy Director position and posted. *Id.*

The DDP job was awarded to Cook, who had previously spent 27 years with the South Carolina Law Enforcement Division ("SLED") conducting investigations and managing other agents. *Id.* at 3–4. Cook was rated with a total of 40 points by Rogers who stated: "30+ law enforcement experience. In current Chief Investigator position for drug diversion for approximately 2 yrs." *Id.* Alvey also rated Cook with the maximum 40 points and stated: "Meets all screening criteria and has vast experience with all aspects of the job. Has been filling the position on an interim basis and has been extremely successful." *Id.*

     C.     Plaintiff's Retaliation Claim

          1.     Plaintiff's Charge

On May 11, 2011, Plaintiff filed a charge of discrimination with EEOC complaining that he was denied a promotion because of his race. Pl. Dep. 71:1–72:15. On June 17, 2011, Plaintiff sent an email to Alvey, Director Templeton, and Human Resources Director Lynn Rivers complaining about his perception that African Americans were not being promoted in the OIE. [Entry #27-6 at 4]. Specifically, Plaintiff indicated that the OIE had 77 employees at the time, only six of whom were African American. *Id.* Plaintiff inquired as to why no African American had been promoted within the OIE since its creation in 2004, despite the fact that these individuals apply for promotions within the office. *Id.* Plaintiff further inquired as to what was being done to remedy this situation. *Id.* Director Templeton met with Plaintiff to discuss his concerns

and informed him that while she could not change any discrimination that allegedly occurred before she took office, she had instituted hiring practices to address concerns about discrimination or favoritism. Templeton Dep. at 10:12–12:25.[3]

### 2. The GPS Pilot Program

As discussed above, Plaintiff was assigned a state vehicle for use in investigating his assigned cases. Barbara Derrick, the Deputy Director of Administration for LLR, became concerned that LLR employees were using fleet vehicles for personal use and not properly recording their travel. [Entry #20-10]. In July 2011, Derrick decided to implement a pilot program to monitor the use of a sample of fleet vehicles by using Global Positioning System ("GPS") tracking devices. *Id.* These devices sent signals that allowed selected managers to monitor routes, arrival and departure locations, and speed of vehicles utilizing computer tracking software. *Id.*

Derrick obtained ten GPS devices and allotted five devices to the OIE. *Id.* Each Assistant Deputy Director was given discretion to select vehicles for GPS placement. Dorman Dep. 15:21–16:12.[4] Dorman, who was Assistant Deputy Director of OIE during this time, placed the names of all 20 OIE employees who had been assigned fleet vehicles and worked from home into a baseball hat and drew five. *Id.* at 17:6–21. The names pulled from the hat were Plaintiff, Gary Martin, Yolonda Rodgers, Bill Davis, and Joe Martin. [Entry #20-10]. Defendant represents that at the end of July these employees were instructed to bring their cars into LLR headquarters for inspection. During the

---

[3] Templeton's deposition may be found at Entry #20-14.
[4] Dorman's deposition may be found at Entry #20-12.

inspection, the GPS devices were installed on their cars. [Entry #20-1 at 11]. Although Derrick's initial email indicated that she would send an email to the employees selected for the GPS program informing them of the same [Entry #20-10], none of the employees in the pilot program were informed that GPS devices had been installed on their cars. Dorman Dep. 23:1–7. After the pilot program was concluded, GPS devices were placed on all fleet vehicles. *Id*. at 23:13–24:8.

Dorman testified that during the first week of the pilot program, he began to notice that the GPS system and Plaintiff's calendar did not match. *Id*. at 21:3–9. Dorman testified that he did not want to make any initial judgments but would continue to determine if there was a problem or a pattern of misuse. *Id*. at 22:10–20. After approximately one month, the monthly fleet logs were turned in and Dorman examined the GPS logs, calendars, ReLAES entries, and monthly fleet logs. [Entry #20–6]. It appeared to Dorman that Plaintiff was using his vehicle for non-work related matters and falsifying documents and records to hide this fact. There were many occasions where the information from Plaintiff's monthly trip logs, the GPS tracking program, the ReLAES program, and his calendar were completely inconsistent. *Id*. Some of the discrepancies include, but are not limited to, the following:

- August 8, 2011: Plaintiff's GPS tracker showed that he had only traveled 87.8 miles, but his fleet log claimed 153 miles.

- August 10, 2011: Plaintiff's fleet log and calendar stated he traveled to Camden to conduct interviews on case number 2011-311. However, ReLAES indicates that he had conducted the interviews over the phone, and the GPS tracker indicates that he had only traveled from his home in Winnsboro to LLR's headquarters in Columbia and back home. Plaintiff claimed in his fleet log that he drove 110 miles, but the GPS tracker showed he only traveled 52 miles.

- August 12, 2011: Plaintiff's fleet log and calendar stated he traveled to Kingstee to conduct an interview on case number 2011-27. However, ReLAES contains no record of Plaintiff conducting any personal interviews in this case. The GPS tracker shows no travel to Kingstree. Instead, it indicates that he traveled to Sumter and Columbia Place Mall.

- August 19, 2011: Plaintiff's fleet log and calendar stated he traveled to Fort Mill to conduct interviews with the respondent and complainant in case number 2011-153. ReLAES indicates that an interview with the respondent was conducted, but does not indicate whether it was conducted in person or by phone. The GPS tracker indicates that Plaintiff traveled from home to Richburg and then to Columbia Place Mall and back home. The GPS tracker shows no travel to Fort Mill.

- September 1–2, 2011: Plaintiff took annual leave from work and was not on duty. Despite the fact that he was performing no work for LLR on those days and was prohibited from using the fleet vehicle for personal use, the GPS tracker shows he drove the fleet vehicle 81 miles on those two days.

[Entry #20-6].

Derrick and Dorman reviewed the results of the investigation, and Derrick recommended Plaintiff be terminated termination. [Entry #20-15 at 2]. Defendant considered the foregoing  irregularities more egregious than an employee taking a state car to lunch because Plaintiff repeatedly used the car for personal use and falsified state records regarding such vehicle use, his whereabouts, and his investigative activities. Templeton Dep. 27:8–28:5. Templeton approved the termination. *Id.* On September 8, 2011, Human Resources Director Lynn Rivers and Supervisor Sharon Wolfe met with Plaintiff and informed him of his termination. Pl. Dep. 88:4–15.

The pilot GPS program also resulted in the termination of Gary Martin, a white male who had not made any complaints of discrimination. [Entry #20-15 at 2]. When

Martin was confronted with his termination, he requested to resign and was allowed to resign. [Entry #20-11 at 1, 3]. Plaintiff did not ask to resign. Rivers Dep. 65:24–66:7.[5]

II.     Discussion

    A.     Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing

---

[5] Rivers' deposition may be found at Entry #20-13.

law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.      Analysis

1.      Race Discrimination Based on Failure to Promote

In Title VII claims,[6] absent direct evidence of discrimination, as is the case here, Plaintiff must prove his allegations under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. Under *McDonnell Douglas*, Plaintiff first must establish by a preponderance of evidence each element of his prima facie case of discrimination. *Id.* at 802. To state a prima facie case of discriminatory failure to promote under Title VII, Plaintiff must prove: (1) he is a member of a protected group, (2) he applied for the position in question, (3) he was qualified for that position, and (4) the defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the decision not to promote. *Id.* This is merely a burden of production, not of persuasion. *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 506 (1993).

---

[6] Section 1981 claims are subject to the same analysis as the Title VII claims. *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649, n. 1 (4th Cir. 2002) (analysis of § 1981 claim the same as Title VII); *Gairola v. Commonwealth of Va. Dept. of Gen. Svcs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same.").

Once Defendant meets its burden by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination.  *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell Douglas*, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against him.

Defendant does not argue that Plaintiff has failed to set forth a prima facie case, but argues that it had a legitimate, non-discriminatory reason for not promoting Plaintiff: that Defendant argues believed the ultimate hires (Ido, Dorman, and Cook) were more qualified. [Entry #20-1 at 17]. Defendant notes that Plaintiff's knowledge of LLR was limited to his work as an investigator with four boards and that, his interviewers, Alvey and Rogers were concerned with his lack of management and supervisory experience. *Id*. Plaintiff's promotion to an Assistant Deputy Director would have had him skip several levels of management. *Id*. The record reflects that Ido, Dorman, and Cook had significant more experience than Plaintiff for the Assistant Deputy Director positions, whereas Plaintiff's experience was very limited because he only held one job during his time with LLR. Plaintiff had no agency experience managing functions and performance of entire

departments. Plaintiff himself appears to concede that it was a stretch and that he was applying for everything that came along to see if he would get hired. Pl. Dep. 18:7–13.

Because Defendant has articulated a legitimate non-discriminatory for failing to promote Plaintiff, the burden shifts to Plaintiff to show that Defendant's reason is pretextual. "A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). However, the Fourth Circuit has held that a plaintiff in failure to promote case is not necessarily required to establish that he was the better qualified candidate for the position sought. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005). An employment discrimination plaintiff may establish pretext by proving that employer's explanation for employment decision is unworthy of credence or that employer's explanation is false. *Id.* In appropriate circumstances, the trier of fact can reasonably infer from falsity of explanation that employer is dissembling to cover up discriminatory purpose. *Id.*

Plaintiff argues that "the circumstances surrounding the hiring process at LLR, both generally and in this specific instance, are questionable at best." [Entry #27 at 14]. In support, Plaintiff notes the following: (1) Templeton and Rivers acknowledged a lack of diversity in LLR's managerial roles; (2) Rivers acknowledged that there had been obvious cases of preselection by Dorman for other jobs; (3) Alvey and Rogers both rated each of the candidates ultimately chosen for the Assistant Deputy Director positions with

perfect scores; and (4) Alvey's and Rogers' ratings of Plaintiff varied by 13 points and only varied by one point for every other candidate.

First, although Templeton and Rivers acknowledged a historical lack of diversity in LLR's managerial positions, Plaintiff has not shown that he has been the victim of historical discrimination. Similarly, Plaintiff has not shown that preselection prevented him from being promoted. Plaintiff cannot show pretext by alleging preselection for a position for which he did not apply by an individual who was not a decision-maker for the jobs for which he did apply. Furthermore, preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate received the position over more qualified candidates, does not equate automatically to discrimination. "Preselection works to the detriment of all applicants, regardless of their race, age, or sex." *Hunnicutt v. SC Dep't of Revenue*, C/A No. 3:08-2589-JFA-JRM, 2010 WL 1344632, *10 (D.S.C. February 26, 2010) (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005); *Blue v. United States Dep't of the Army*, 914 F.2d 525, 541 (4th Cir. 1990)). While preselection can show that a selection process was unfair, it "does not by itself prove racial discrimination." *Blue*, 914 F.2d at 541; *see also Oates v. District of Columbia*, 824 F.2d 87, 93 (D.C.Cir. 1987) ("An ill-informed motivation, or even an illegal motivation, is not necessarily a discriminatory one. . . ."). "Title VII does not ensure the best will be selected—only that the selection process will be free from impermissible discrimination." *Casillas v. United States Navy*, 735 F.2d 338, 344 (9th Cir. 1984).

Plaintiff also emphasizes the discrepancy between Alvey's and Rogers' ratings for him and argues that it is "telling of bias against Plaintiff by Alvey." [Entry #27 at 4]. Even if true, Alvey's alleged bias against Plaintiff does not appear to be based on his race, as Alvey rated David Christian, another African American who applied for all three positions, second-highest overall. [Entry #20-16 at 7–8]. Alvey rated Christian ten points above Plaintiff and one point higher than Rogers rated Christian. [Entry #20-16 at 7–8]. Therefore, Plaintiff has not shown that Alvey's and Rogers' ratings of him demonstrate that Defendant's reasons for promoting others were pretext for race discrimination.  In addition, the fact that Alvey and Rogers rated the candidates ultimately chosen for the position with perfect scores, reinforces Defendant's contention that they were viewed as better qualified than Plaintiff. The undersigned recommends Defendant be granted summary judgment on Plaintiff's Title VII and § 1981 race discrimination claims.

2.    Retaliation

Plaintiff asserts a retaliation claim under Title VII based on his termination. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the

adverse action.  *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998). Once Plaintiff establishes the elements of his prima facie case, the burden shifts to Defendant to proffer a legitimate, non-discriminatory reason for taking the adverse employment action.  *See Burdine*, 450 U.S. at 253.  Plaintiff then has the burden to show that Defendant's legitimate, non-retaliatory reason is pretextual.  *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 271 (4th Cir. 2001).

Defendant concedes that Plaintiff engaged in a protected activity by making complaints of race discrimination approximately three months before his termination and that his termination constitutes an adverse employment action. [Entry #20-1 at 22]. However, Defendant argues that Plaintiff cannot show that there was a causal connection between his protected activity and his termination.

Plaintiff argues that he has shown a causal connection based on: (1) the three-month temporal proximity between his complaints and his termination; and (2) Derrick's and Alvey's knowledge of his charge of discrimination. [Entry #27 at 15]. The Fourth Circuit has held that a temporal proximity of three months is insufficient alone to show a causal connection. *See, e.g., Pascual v. Lowe's Home Ctrs., Inc.*, No. 05-1847, 2006 WL 2226571 (4th Cir. Aug. 2, 2006) (holding that three to four months between the termination and protected activities is too long to establish a causal connection by temporal proximity alone); *Shields v. Federal Express Corp.*, No. 03-2103, 2005 WL 102990 (4th Cir. Jan. 19, 2005) (three to four months was insufficient to raise an inference). Although Plaintiff argues that Derrick and Alvey both knew of his discrimination charge and were both involved in the decision to terminate him, such

16

evidence is insufficient to show causation even when combined with Plaintiff's three-month temporal proximity. Therefore, the undersigned recommends the district judge find that Plaintiff has failed to set forth a prima facie case of retaliation.

Even if Plaintiff were able to show a causal connection, Defendant has set forth a legitimate non-discriminatory reason for terminating him. Defendant asserts that Plaintiff was terminated because he misused a state vehicle and misrepresented of state documents for at least a month. [Entry #20-1 at 22]. Defendant asserts that Plaintiff misrepresented his trip log, what he was doing, and where he went during his work hours. *Id*. Defendant also terminated a Gary Martin, a white male for the same reasons. Defendant having provided a legitimate non-discriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to show that Defendant's proffered reason is pretextual.

Plaintiff argues that Defendant's proffered reason is pretext because: (1) Plaintiff's inclusion in the GPS pilot program is "suspicious" because out of twenty employees, two of the five chosen were African American; (2) Plaintiff was treated differently from Gary Martin, who he alleges was given a warning a few days before being terminated; (3) Plaintiff did not receive progressive discipline; and (4) Defendant allegedly failed to include HR in the decision to terminate Plaintiff. [Entry #27 at 16–18].

Plaintiff argues that the fact that he was chosen for the pilot program is suspicious because two of the five people chosen, from a pool of 20, were African American. Plaintiff does not set forth any evidence regarding how many African Americans were in

the group of 20,[7] or why such statistics matter. The only evidence is that Dorman placed the 20 names in a hat and drew five. Dorman Dep. 17:6–21. Plaintiff's suspicions about the process alone are insufficient to support an inference that Plaintiff's name was intentionally chosen for the pilot program.

Plaintiff next argues that Defendant treated Gary Martin more favorably because he was "counseled" prior to being terminated and allowed to resign. [Entry #27]. Dorman questioned Martin four weeks into the pilot program about which cases required that he have local travel. [Entry #20-11]. Martin responded on August 26, 2011, that he was using the state car to get lunch. *Id*. On August 31, 2011, Derrick directed Martin only to use the car when he was in travel mode and not for personal business. *Id*. Martin continued using the car for local travel in Manning and was terminated eight days later (six days before Plaintiff's termination). There is no evidence that Martin was disciplined prior to his termination.

Plaintiff's argument that Martin was treated differently than Plaintiff is insufficient to show that Defendant's reasons for terminating Plaintiff were pretext. Dorman's questioning of Martin appears to have been for legitimate business reasons, as Martin's misuse of the state car all occurred in his hometown when he was working from home. Therefore, Dorman's questioning clarified whether Martin had cases that required local travel. Derrick sent an email about the appropriate use of the state car because Martin had freely admitted that he had used the car to get lunch. On the other hand, Dorman appears

---

[7] Even if there were only two African American employees in the group of 20, such a fact is not necessarily suspicious on its own. For instance, the undersigned notes that two of the five people chosen for the pilot program also had the last name "Martin."

to have not needed clarification regarding Plaintiff, because his misuse of the state car was more flagrant. For example, Plaintiff had misrepresented on his fleet log that he traveled to cities for interviews when in fact he had never personally met the people interviewed. With regard to Defendant's allowing Martin to resign, Defendant points out that at his termination, Martin requested to resign, whereas Plaintiff did not so request.

Plaintiff next claims that Defendant's reason for terminating him was pretext because he was not given progressive discipline. Martin was also terminated without progressive discipline as a result of abuses of his state car. Plaintiff does not explain how his termination without progressive discipline tends to show that Defendant's reason for terminating him was pretext, particularly in light of Defendant's termination of Martin without progressive discipline.

Finally, Plaintiff claims that Defendant's failure to include human resources in the decision to terminate Plaintiff shows Defendant's reasons were pretext. However, Human Resources Director Rivers testified that she was under doctor's care and working part-time when Plaintiff was terminated and had played no part in the GPS pilot program investigation. Rivers Dep. 38:8–11. Plaintiff cannot show how Rivers' absence in the termination decision shows pretext under these facts. Because Plaintiff has failed to show that Defendant's reason for terminating Plaintiff was pretext, the undersigned recommends the district judge grant Defendant summary judgment on Plaintiff's retaliation claims.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment [Entry #20] be granted.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 13, 2014                               Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).